**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

WILDEARTH GUARDIANS,

      Plaintiff,

v.

IRG BAYAUD, LLC, a Colorado limited liability company; BRENT ANDERSON, an
individual, and JOHN YERTON, an individual,

      Defendants.

---

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

---

**INTRODUCTION**

1.    Plaintiff WildEarth Guardians ("Guardians" or "Plaintiff") brings this suit against IRG

    Bayaud, LLC, Brent Anderson, and John Yerton (referred to collectively as "IRG" or

    "Defendants") pursuant to the citizen suit provision of the Federal Water Pollution Control

    Act, more commonly referred to as the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et*

    *seq*., for Defendants' past and continuing violations of the CWA.  Guardians seeks

    declaratory and injunctive relief, the imposition of civil penalties, and recovery of litigation

    expenses, including attorney fees and costs pursuant to 33 U.S.C. § 1365(d).

2.    Defendants operate a 37-acre former mining site located at 1271 W. Bayaud Avenue,

    Denver, Colorado 80223 (the "Facility").  The Facility was the location of the General

    Chemical Corporation's industrial activities such as ore and mineral beneficiation

operations and processing, chemical manufacturing, mine tailings and slag disposal, and aluminum sulfate manufacturing since approximately 1887.

3. IRG took ownership of the former General Chemical Corporation Facility in 2008 for the purpose of implementing a clean-up plan to address soil and ground water contamination at the Facility (from the historic mining activities) and then selling the Facility to the City and County of Denver for a profit. According to IRG's website, IRG specializes in "negotiating cost-effective environmental outcomes."

4. The Facility is located on the western bank of the South Platte River—less than four miles upstream of Confluence Park in Denver, an area that receives substantial use by the public, as well as fish and other aquatic species.  Confluence Park provides a riverside oasis for the public, especially during the hot summer months, providing swimming, kayaking, wading, tubing, and picnicking.

5. The Facility also abuts the popular urban trail system that extends for over a hundred miles along the South Platte River through Denver and its surrounding suburbs serving as a corridor for runners, hikers, bikers and anglers.

6. The Facility discharges a spectrum of pollutants, including arsenic and acidic wastewater, into the South Platte River, a water of the United States.  These discharges are regulated by the Facility's CWA National Pollutant Discharge Elimination System ("NPDES") which IRG took ownership of from the General Chemical Corporation in 2008 when they took ownership of the Facility.

7. Discharges of pollutants are only authorized under the CWA if they meet the specific effluent limitations contained in IRG's NPDES Permit under the CWA.  In Colorado,

NPDES permits are issued by the State, and the permit for IRG is known as NPDES Permit and Colorado Discharge Permit System Permit No. CO0046329 ("NPDES Permit"). The Water Quality Control Division of the Colorado Department of Public Health and the Environment ("Division") issued the NPDES Permit pursuant to state and federal law and regulations.

8. Legally required Discharge Monitoring Reports ("DMRs") submitted by IRG to the Division on a monthly basis pursuant to its NPDES Permit plainly acknowledge that the Facility has repeatedly and consistently violated and is continuing to violate the requirements of its NPDES Permit and the CWA.

9. Defendants' acidic discharges have occurred virtually every month since IRG received their Permit in March 2008 and have significantly exceeded the authorized effluent limitations in the permit.

10. IRG has: (a) discharged and continues to discharge pollutants that exceed the permitted effluent limits for pH in its NPDES Permit; (b) failed to perform quarterly Whole Effluent Toxicity ("WET") testing; (c) failed to perform Preliminary Toxicity Incident/Toxicity Identification Evaluation ("PTI/TIE") investigations or accelerated testing as required by the NPDES Permit, (d) failed to timely report violations of discharges that exceed effluent limitations and to take steps to reduce and eliminate the non-compliance; and (e) failed to properly operate and maintain all pollution treatment and control systems necessary to comply with the limits in the NPDES Permit.

11. On January 31, 2014, IRG informed the Division that it would no longer perform any of the obligations required by the Permit, including monitoring and reporting concentrations of

toxic heavy metals, including arsenic, in the groundwater under the Facility, performing quarterly WET testing, performing PTI/TIE investigations and accelerated testing, and submitting monthly discharge monitoring reports ("DMRs").

12. In response, both the Division and Colorado Attorney General's office has informed IRG that it continues to be legally bound to comply with the requirements of its NPDES Permit, including the monitoring, reporting and pollution control requirements of the NPDES Permit, and warned IRG against its continued violations of state and federal law, but has not taken any enforcement action.

13. IRG's actions are in violation of the CWA, its implementing regulations and the terms of the NPDES Permit.

14. Defendants' CWA violations are ongoing as of the date of this Complaint and reasonably likely to continue.

15. Plaintiff seeks declaratory and injunctive relief and the imposition of civil penalties resulting from these violations.  Plaintiff also seeks an award of attorney fees and costs pursuant to 33 U.S.C. § 1365(d).

**JURISDICTION AND VENUE**

16. Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a) (citizen suit provision of the CWA).  This Court has subject matter jurisdiction over the claims specified in this Complaint under 33 U.S.C. § 1365(a).  The relief requested is authorized by 33 U.S.C. §§ 1319(d) and 1365(a).  An actual, justiciable controversy exists between Plaintiff and Defendants.  The requested relief is proper under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

17.  Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff notified Defendants of Defendants' violations of the CWA and of Plaintiff's intent to sue under the CWA by letter dated and postmarked October 17, 2013 ("Notice Letter").  Plaintiff notified the Defendants, Defendant's registered agent, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region 8 and the Division Director of its intent to sue Defendants by mailing copies of the Notice Letter to these officials on October 17, 2013.  Defendants all received the Notice Letter.

18.  More than sixty days have passed since Plaintiff served and since Defendants received the Notice Letter.

19.  Neither the EPA nor the Division has commenced and diligently prosecuted an action that would preclude this action under either 33 U.S.C. § 1319(g)(6) or 1365(b)(1)(B).

20.  The source of all violations complained of and the Facility are located in Denver, Colorado which is within the District of Colorado.  Venue in the District of Colorado is therefore proper pursuant to 28 U.S.C. 1391(b)(2) and more specifically 33 U.S.C. § 1365(c).

## PARTIES

21.  Defendant IRG BAYAUD LLC is a Colorado limited liability company and is listed in the Division's files as the operator of the Facility in the NPDES Permit.

22.  IRG's business model involves acquiring environmentally contaminated properties, assuming cleanup liability and responsibility, and redeveloping such properties.

23.  Brent Anderson is the Chief Executive Officer of IRG Bayaud, LLC.

24.  Brent Anderson has held this position during the time which the violations alleged here occurred.

25. Brent Anderson has been personally aware of the violations alleged here.

26. Brent Anderson has the control and authority sufficient to affect the operations and pollution discharges from the Facility.

27. John Yerton is the Project Manager at the Facility.

28. John Yerton has held that position during the time that the violations alleged here occurred.

29. John Yerton has been personally aware of the violations alleged here.

30. John Yerton has the control and authority sufficient to affect the operations and pollution discharges from the Facility.

31. Brent Anderson and John Yerton share personal responsibility and liability for violations that have occurred and are continuing to occur at the Facility.

32. Plaintiff WILDEARTH GUARDIANS is a 501(c)(3) non-profit, public interest conservation organization with one of its main offices in Denver, Colorado. Guardians' mission is to protect and restore wildlife, wild places, and wild rivers in the American West. This work includes protection of water quality in the rivers and streams of Colorado, such as the South Platte River.

33. Guardians uses education, advocacy and, when necessary, legal enforcement tools authorized under the federal CWA to achieve its goals.

34. Guardians has more than 43,000 members and activists, many of whom live, work, and recreate in areas affected by the CWA violations described herein.

35. Guardians has members, supporters, and staff that regularly use and enjoy the South Platte River, including the waters immediately upstream and downstream from Defendants' discharges at the Facility. Guardians' staff and members use and enjoy the river and the

adjacent trail system fishing, boating, kayaking, bird watching, nature photography, hiking, biking and other recreational, environmental, scientific, vocational and other such activities and interests.  The pollution associated with the Defendants' discharges in violation of the applicable NPDES Permit limits has a negative impact on Guardians, its staff and members and their ability to enjoy those activities and interests.  The pollutants discharged by Defendants threaten the health and safety of Guardians' members by exposing members who engage in water contact recreational activities, such as boating, kayaking, swimming and fishing to pollutants that threaten their ability to safely enjoy these activities.

36.    Guardians, its staff, and members intend to continue to use these same waters in the future and have specific and near-term plans to return to use such waters for the uses described above in the spring and summer of 2014.  But, ongoing pollution from the Facility also deters Guardians' members from using and enjoying such waters as they otherwise would because of reasonable and scientifically-based concerns about the adverse effects of Defendants' discharges.

37.    Additionally, Defendants' discharges adversely affect the abundance and health of fish and wildlife species in waters upstream and downstream from its discharges and this decreases the abundance of these species.  This harms and reduces Guardians' members' ability to see, enjoy, and fish for such species for aesthetic and recreational purposes.

38.    Guardians and its members are also injured by the Defendants' failure to accurately report and provide required pollutant monitoring data and timely notice when the Facility's pollutant discharges exceed permitted effluent limits.  The timely notice required by the applicable NPDES Permit provides the Division with the opportunity to notify the public,

including Guardians' members, of particularly significant threats if warranted.  Through public record laws, Guardians and its members also have the ability to learn of such exceedances and take necessary precautions, such as refraining from recreating in waters impacted by such an exceedance.  Absent timely reporting, however, Guardians and its members are left without important information they could use to avoid areas impacted by such unpermitted discharges.  Additionally, without timely reporting, Guardians' members use of areas impacted by the Facility's discharges are degraded and adversely affected at all times of use because of uncertainty regarding whether violations are occurring or have recently occurred that could create a threat to human health and the environment.

39.   The instant action would redress the harms faced by Guardians and its members by requiring the Facility to reduce its pollutant discharges to levels that comply with authorized limits.  It would result in civil penalties that would deter future violations that threaten Guardians' members' use and enjoyment of upstream and downstream waters.

40.   The foregoing are actual, concrete injuries suffered by Guardians and its members that are fairly traceable to Defendants' violations and are capable of redress by action of this Court. Plaintiff has no other adequate remedy at law.

## STATUTORY BACKGROUND

41.   Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  In doing so, Congress declared a national goal of eliminating discharges of pollutants to navigable waters by 1985.

42. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the point source discharge of pollutants to navigable waters of the United States unless the discharge is in compliance with a NPDES Permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

43. "Navigable waters" are broadly defined as "the waters of the United States." 33 U.S.C. §§ 1362(7) & (14).

44. The "discharge of a pollutant" means any "addition of a pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutant is defined to include "industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged. 33 U.S.C § 1362(7); 40 C.F.R. § 122.2.

45. The NPDES permitting scheme is the primary means by which discharges of pollutants are controlled. NPDES permits must include conditions that will ensure compliance with the CWA.

46. Although EPA is the administrator of the CWA, section 402 of the Act, 33 U.S.C. § 1342, authorizes EPA to delegate its authority to states to implement and administer the CWA. 33 U.S.C. § 1342(b). In 1975, EPA delegated responsibility to administer the NPDES permit program to the State of Colorado via its Colorado Discharge Permit System.

47. CWA violators are subject to enforcement activities initiated by EPA, states, and citizens. 33 U.S.C. §§ 1319, 1365(a); 40 C.F.R. § 135. Citizens are required to provide notice of

any alleged violations sixty days prior to commencing suit.  33 U.S.C. § 1365(b).  After sixty days have passed, citizens may bring an action in federal district court to enforce against any ongoing violations of the CWA.

48.  Section 505 of the CWA authorizes citizens to bring suit against any person, including a corporation or company, that is alleged to be in violation of an effluent standard or limitation under the CWA.  33 U.S.C. § 1365(a).  Effluent limitation is defined broadly to include "any unlawful act under subsection (a) of [section 301] of this title."  33 U.S.C. § 1365(f).

49.  CWA violators are subject to a civil penalty not to exceed $37,500 per day per violation of the Act.  See 33 U.S.C. § 1319(d) (civil penalties); 40 C.F.R. § 19.4 (adjusting the amount for inflation).

## STATEMENT OF FACTS

### A.  Background

50.  In 2008, IRG acquired the Facility which is a 37-acre site previously operated by General Chemical Corporation.

51.  IRG acquired the Facility for the sole purpose of remediating the pollution at the site with the most cost-effective environmental remediation and then selling the Facility to the City and County of Denver for a profit.

52.  The City and County of Denver took ownership of the Facility in 2009.

53.  The Facility was the location of ore processing, mine tailings, waste rock and slag disposal, and chemical manufacturing activities beginning in approximately 1887.

54. The Facility is located at 1271 W. Bayaud Avenue, Denver, Colorado 80223 and is situated on the western bank of the South Platte River.

55. The facility is located on sandy alluvium with fine to course grained sands and gravels.

56. As part of the remediation plan, IRG removed select contaminated soils, collected ground water data, backfilled the excavations with a layer of limestone fines and crushed concrete, and installed a low permeable soil cap.  Most of the historic contamination on the site was not removed prior to site redevelopment, but was instead left on-site. Of the remediation plans identified, this was one of the least expensive options.

57. The historic contaminants that continue to be present on the site include metal processing slag, coal, arsenic, and pyrite materials.

58. Prior to installation of the low permeable soil cap at the Facility, pyrite-bearing wastes exposed to atmospheric oxygen oxidized and leached acidic solutions high in sulfate, arsenic and metals such as cadmium down to the water table in the ground water.

59. The installation of the low permeable soil cap successfully prevented the infiltration of oxygenated recharge to the ground water and raised the groundwater pH (the pH, however, is still below permit limits).  This cap installation had the unintended consequence of depleting oxygen from the groundwater under the site and creating anaerobic "reducing" conditions which have resulted in increased discharges of increased concentrations of arsenic into the ground water.

60. The groundwater underneath the Facility is hydrologically connected to the South Platte River.

61.  There is a significant biological, chemical and physical nexus between the groundwater and the South Platte River.

62.  The Facility discharges pollutants to the South Platte River via a seep and other discrete point source conveyances located on the western bank of the South Platte River.

63.  On March 7, 2008, General Chemical transferred the NPDES Permit to IRG.

64.  The NPDES Permit regulates discharges to the South Platte River and requires, among other things, IRG to discharge wastewater within certain effluent limits and requires IRG to perform monitoring, including WET testing to measure the aggregate toxic effect to aquatic organisms from all pollutants contained in the Facility's effluent.

65.  Despite these effluent limitations in the NPDES Permit, IRG has discharged acidic wastewater in violation of its NPDES Permit every month since the inception of its Permit in 2008.

66.  IRG has failed to perform the required quarterly WET testing under the NPDES Permit.

67.  IRG has failed to perform the required PTI/TIE investigations or accelerated testing under the NPDES Permit.

68.  On January 31, 2014, IRG renounced its NPDES Permit and has refused to perform any of its obligations under the NPDES Permit.

69.  As a result, IRG is failing to collect or submit pollution monitoring data available to the Division and the public regarding the levels and types of pollutants it is discharging into the South Platte River.

70.   Defendants are all "persons" within the meaning of § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and is subject to suit under the CWA citizen suit provision, 33 U.S.C. § 1365.

71.   The ground water seep as well as the discrete fissures, conduits, pipes, channels, and conveyances that discharge polluted groundwater to the South Platte River are "point sources" under the CWA.  33 U.S.C. § 1362(14).

72.   Defendants discharge "pollutants," as that term is defined in the CWA, including pH, through a "point source" into the South Platte River.

73.   The South Platte River is a water of the United States as defined by 33 U.S.C. §§ 1311(a), 1362(7) and 40 C.F.R. § 230.3(s)(5).

74.   The Facility's NPDES Permit limits the acidity and alkalinity of the pollutants in the Defendants' discharges through permit limits on pH.

75.   Discharges of wastewater that exceed allowed limits for pH present a threat to aquatic species, potentially increase toxic metal concentrations being discharged from the Facility, and adversely affect use of public waters for water contact recreation.

76.   The Division has repeatedly notified IRG of its non-compliance with the pH and WET testing effluent limitations and monitoring obligations in the NPDES Permit.  However, the Division has failed to take any formal enforcement or assess any penalty against IRG.

**B.  IRG's Violations of the Effluent Limitations in its NPDES Permit**

77.   Defendants have consistently violated and continue to violate various conditions of its NPDES Permit, as explained below.

**1.  Numeric Effluent Limitations for pH**

78.   Defendants have violated and continue to violate the effluent limitation in their NPDES Permit for pH at Outfall 001-A. The NPDES Permit limit for pH is a daily maximum of 9 standard units and a daily minimum of 6.5 standard units.   Defendants have reported violating this NPDES Permit condition on the following dates and in the following amounts identified in paragraph 79.

79.

| Discharge Dates (End of reporting period) | pH of reported discharges |
|---|---|
| 12/31/13 | 5.13 |
| 11/31/13 | 5 |
| 10/31/13 | 5.43 |
| 9/31/13 | 5.68 |
| 8/31/13 | 4.89 |
| 7/30/13 | 5.39 |
| 6/30/13 | 4.41 |
| 5/31/13 | 4.33 |
| 4/30/13 | 4.67 |
| 3/31/13 | 4.69 |
| 2/28/13 | 4.92 |
| 1/31/13 | 4.61 |
| 12/31/12 | 4.25 |
| 11/30/12 | 3.77 |
| 10/31/12 | 3.85 |

| Dates Con't | pH con't |
|---|---|
| 9/30/12 | 4.25 |
| 8/31/12 | 4.18 |
| 7/31/12 | 4.13 |
| 12/31/11 | 4.58 |
| 11/30/11 | 6.11 |
| 10/31/11 | 6.11 |
| 9/30/11 | 5.76 |
| 8/31/11 | 4.83 |
| 7/31/11 | 4.54 |
| 6/30/11 | 4.52 |
| 5/31/11 | 4.86 |
| 4/30/11 | 5.81 |
| 3/31/11 | 5.72 |
| 2/28/11 | 5.68 |
| 1/31/11 | 5.85 |
| 12/31/10 | 6.21 |
| 11/30/10 | 5.13 |
| 10/31/10 | 5.09 |
| 9/30/10 | 5.01 |
| 8/31/10 | 4.49 |
| 7/31/10 | 4.2 |
| 6/30/10 | 4.34 |
| 5/31/10 | 3.97 |
| 4/30/10 | 4.08 |

| Dates con't | pH con't |
|---|---|
| 3/31/10 | 4.28 |
| 2/28/10 | 4.48 |
| 1/31/10 | 4.59 |
| 12/31/09 | 4.65 |
| 11/30/09 | 5.67 |
| 10/31/09 | 5.27 |
| 9/30/09 | 4.52 |
| 8/31/09 | 4.26 |
| 7/31/09 | 3.84 |
| 6/30/09 | 3.06 |
| 5/31/09 | 6.24 |
| 4/30/09 | 6.14 |
| 3/31/09 | 5.7 |
| 2/28/09 | 5.64 |
| 12/31/08 | 5.35 |
| 11/30/08 | 5.22 |
| 10/31/08 | 5.35 |

80.   Because of the continuous, uninterrupted nature of the low pH discharges since inception of the Permit contained in IRG's own self-reported sampling (DMR data is unavailable for January 2012-June 2012 and January 2009), IRG has violated the pH effluent limitation every day since October 31, 2008 to present or 1,998 days (the violations go further back but Plaintiffs are only seeking penalties for violations within the federal five year statute of limitations which tolled upon receipt of the 60-day notice letter in October 2013).

16

81. Defendants have violated and continue to violate the effluent limitation in the applicable NPDES Permit for pH and have now refused to continue monitoring and reporting the results of the required pH sampling under the Permit as of January 2014.  Therefore, IRG continues to violate the pH effluent limitations in the permit and will continue until enjoined.

**2. WET Testing**

82. IRG's NPDES Permit also requires the Facility to perform quarterly WET testing to measure the aggregate toxic effect to aquatic organisms from all pollutants contained in the Facility's effluent.

83. Theses tests are very important for a facility such as IRG's with a diverse complexity of interacting toxic pollutants because they expose live aquatic insects to actual samples of IRG's effluent as a real world barometer of actual toxicity.

84. IRG's remediation plan has increased the concentrations of arsenic released into the groundwater and ultimately to the river.  Arsenic is toxic to aquatic organisms at very low concentrations.  Therefore, WET testing is particularly important for this Facility.

85. IRG has repeatedly refused to perform WET tests as required under its NPDES Permit.

86. IRG has only performed three (3) WET tests since the inception of the NPDES Permit in 2nd quarter 2008, 3rd quarter 2008 and 4th quarter 2013.  All tests failed, meaning that IRG's toxic effluent concentrations are lethal to the test organisms, which in this case are fathead minnows and water fleas.  If the WET test fails, the NPDES Permit requires IRG to perform a Preliminary Toxicity Incident/Toxicity Identification Evaluation (PTI/TIE) investigation or an accelerated testing using a single species found to be more sensitive.

The Division waived the requirement to perform this testing for the first two failed WET tests in 2008, but did not waive this Permit requirement for the third WET test failure in 4th quarter 2013.

87. Each failure to perform a quarterly WET test since December 2008 (4th quarter 2008) constitutes a separate and distinct violation of the NPDES Permit for a total of 21 violations to date (every quarter since October 2008 to date except 4th quarter 2013)

88. Based on IRG's consistent WET test failures, had IRG performed all required WET testing, these tests would have triggered the requirement to perform a PTI/TIE investigation or an accelerated testing using a single species found to be more sensitive.  Each failure to perform PTI/TIE or accelerated testing constitutes a separate and distinct violation for a total of 22 violations to date since December 2008 (including the failed WET test from 4th quarter 2013).

**C.  Monitoring and Reporting Violations**

**1.  Failure to submit DMRs**

89. IRG has failed to perform any of its monitoring obligations under the NPDES Permit from January 2014, when it renounced its obligations under the NPDES Permit, to the present. During this time, IRG has failed to perform its required monthly monitoring and reporting for numerous pollutants, including pH and several toxic heavy metals, such as arsenic.

90. The NPDES Permit requires IRG to submit DMRs which report sampling results for daily and monthly pollutant concentrations for pH, arsenic, aluminum, cadmium, copper, manganese, and zinc.

91. Since 2014, IRG has failed to submit its required monthly DMRs reporting the discharge monitoring results to the Division and the public as required by the NPDES Permit.

92. Each failure to monitor and report constitutes a separate and distinct violation.  These violations are ongoing.

**2.  Failure to provide noncompliance notifications to the Division**

93. IRG has never reported instances of its pH effluent limitations non-compliance to the Division as required by its NPDES Permit.  Part II.A.4(c) of the NPDES Permit requires IRG to provide the Division and the EPA with (a) a description of the discharge and cause of noncompliance, (b) the period of noncompliance, and (c) the steps being taken to eliminate, reduce and prevent the non-complying discharge.

94. Each time IRG failed to timely report these violations represents a distinct violation of its NPDES Permit and, thus, a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311, and its implementing regulations, 40 C.F.R. § 122.41(a), which prohibit violation of this NPDES Permit.

95. These types of reporting violations are of a continuing nature and are in addition to the underlying effluent discharge violations.

**D.  Failure to Properly Operate and Maintain Violations**

96.  IRG has also violated and continues to violate the NPDES Permit by failing to properly operate and maintain all pollution treatment and control facilities and systems that are necessary to comply with the effluent limits in the NPDES Permit as required by Permit Section II. A. 9.

97. IRG has failed to properly operate and maintain the Facility every day since January 31, 2014 when it refused to comply with its NPDES Permit obligations.  These violations are ongoing.

98. Additionally, the regular and consistent pH effluent limit violations at the Facility demonstrate that the Facility has never been properly operated and maintained.

99. IRG has also failed to operate and maintain the Facility by choosing a low cost remediation method (low permeable soil cap) that has failed.  The remediation has not prevented the discharge of acidic wastewater and the remediation method has resulted in increased concentrations of arsenic being discharged into the South Platte River.

100. Given the persistent NPDES Permit violations, Defendants have violated and continue to violate their NPDES Permit by failing to properly operate and maintain systems of collection, treatment and disposal, as required by their NPDES Permit, on every day that an illegal discharge or permit violation has occurred at the Facility since October 31, 2008 to present for 1,998 violations.

101. The failure to operate and maintain the Facility is a consistent and ongoing violation. IRG benefited economically as a consequence of the effluent limitation violations described in this Complaint.

102. Defendants have chosen a low cost remediation option and have avoided the costs associated with installing the proper operation controls to avoid effluent limitation violations.

103. These costs include, but are not limited to, installing a remediation option that complies with the NPDES Permit, hiring consultants, fees associated with installation, implementing

Best Management Practices to comply with the NPDES Permit, purchasing and maintaining technology to comply with the NPDES Permit, and altering business practices to control the sources of pollution restricted by the NPDES Permit.

### FIRST CLAIM FOR RELIEF

**Discharge of Pollutants in Violation of Terms of NPDES Permit**
**(Violations of 33 U.S.C. Sections 1311(a))**

104. Plaintiff incorporates and re-alleges all preceding paragraphs.

105. Defendants' violation of the pollutant effluent limits contained in its NPDES Permit constitute violations of 301(a) of the CWA, 33 U.S.C. § 1311(a) and regulations implementing the CWA, including 40 C.F.R. § 122.41(a).

106. These violations include but are not limited to exceedances of the NPDES Permit's numeric effluent limits for pH, failure to perform WET tests, failure to perform PTI/TIE investigations or accelerated testing as required by the NPDES Permit, and the failure to properly operate and maintain pollution control and reduction equipment at the Facility by choosing to ignore the requirements of the NPDES Permit and by choosing a low cost remediation method that has failed to control acidic wastewater discharges and has increased concentrations of arsenic discharges into the South Platte River.

107. As defined by the CWA, Defendants are "persons" responsible for discharging "pollutants" from a "point source" into the "waters of the United States" in violation of the "effluent limitations" contained in the applicable NPDES Permit.  33 U.S.C. § 1362.

108. Each day of violation constitutes a separate and distinct violation under the CWA.

109. These violations are ongoing and there is more than a reasonable likelihood that they will recur and a realistic prospect they will continue absent redress from this Court.

## SECOND CLAIM FOR RELIEF

### Violation of Reporting and Monitoring Requirements in NPDES Permit
### (Violations of 33 U.S.C. § 1311(a))

110.   Plaintiff incorporates and re-alleges all preceding paragraphs.

111.   Defendants have repeatedly failed to perform their monthly monitoring obligations under the NPDES Permit.

112.   These violations include failing to submit required DMRs and failing to provide noncompliance notifications to the Division as required by the NPDES Permit.

113.   These failures are NPDES Permit violations and are in violation of 301(a) of the CWA, 33 U.S.C. § 1311(a), and regulations implementing the CWA at 40 C.F.R. § 122.41(a).

114.   Each day of violation constitutes a separate and distinct violation under the CWA.

115.   These violations are ongoing and there is a reasonable likelihood they will recur and a realistic prospect that they will continue absent redress from this Court

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.   Declare that Defendants have violated and continue to be in violation of its NPDES Permit and Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342;

B.   Order Defendants to take specific actions to remediate the past and future environmental harm caused by their violations;

C.   Order that Defendants pay remedial action costs to fix its failed low cost remediation, in an amount to be determined at trial, and to be paid into an escrow account for the sole purpose of funding the necessary remediation;

D.   Enjoin Defendants from further violations of the terms of its NPDES Permit;

E.   Retain jurisdiction over this matter until such time as Defendants have come into compliance with the prohibitions, terms, and conditions of their NPDES Permit and the CWA;

F.   Enter a money judgment imposing maximum civil penalties against Defendants for violations of the CWA in the amount of $37,500 per day per violation multiplied by 1,998 days pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. § 1319(d), and 1365(a), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. Part 19;

G.   Award Plaintiff its litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

H.   Grant such other relief as this Court deems appropriate.

DATED this 23rd day of April 2014.

Respectfully submitted,

/s/  Ashley Wilmes
Ashley Wilmes
WildEarth Guardians
Colorado Bar No. 40798
680 W. Hickory Street
Louisville, CO 80027
Tel. 859-312-4162
awilmes@wildearthguardians.org

/s/ R. Scott Jerger
R. Scott Jerger
Field Jerger LLP
Oregon State Bar No. 023377
Email: scott@fieldjerger.com
621 SW Morrison, Ste. 1225
Portland, OR 97205
Tel: (503) 228-9115
Fax: (503) 225-0276

Attorneys for WildEarth Guardians